### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

RENAE UNRUH,               )
                       )
         **Plaintiff,**      )
                       )     **No. 17 C 1782**
     **v.**                )
                       )     **Judge Rubén Castillo**
HUMANA INSURANCE COMPANY, et al., )
                       )
        **Defendants.**    )

### <u>MEMORANDUM OPINION AND ORDER</u>

*Pro se* plaintiff Renae Unruh ("Plaintiff") brings this action alleging violations of the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, and the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, and various state law claims against Humana Insurance Company ("Humana"), Nancy Kavalle ("Kavalle"), and Donna Schoenheider ("Schoenheider"). Before the Court is Defendants' motion for summary judgment. (R. 86.) For the reasons that follow, the motion is granted as to all claims except state law age discrimination (Count VII) which is dismissed without prejudice.

### RELEVANT FACTS

The following facts are undisputed unless otherwise noted.[1] Plaintiff was employed by Humana from approximately March 2, 2014, to December 6, 2016. (R. 88, Defs.' SOF ¶¶ 1, 14.)

---

[1] As discussed in greater detail below, although Plaintiff filed five separate oppositions to the summary judgment motion, she failed to respond to most of Defendants' Local Rule 56.1 Statement of Material Facts in any manner that comports with the rules. (*See infra,* Procedural History.) Accordingly, the Court deems admitted all of Defendants' asserted facts that are properly supported by the record. *Frey Corp. v. City of Peoria*, 735 F.3d 505, 513 (7th Cir. 2013).

She held the position of "Utilization Review – Sub-Acute – Oak Brook," in which she acted as a clinical registered nurse ("RN") advisor for sub-acute matters, collaborating with healthcare providers in reviewing actual and proposed medical care and services for Humana Plan members against established coverage guidelines review criteria. (*Id.* ¶¶ 14, 15.) Nancy Kavalle was employed by Humana as a "Front Line Leader" and was Plaintiff's direct supervisor. (*Id.* ¶ 3.) Donna Schoenheider was employed by Humana as a "Utilization Management Manager." (*Id.* ¶ 4.)

Humana maintains an attendance expectations policy which states that employees are expected to be punctual and in attendance each of their scheduled work days in order to maintain efficiency and productivity, and that repeated absences and tardiness even for good reason may result in termination. (*Id.* ¶ 7.) It also maintains a flexible policy regarding paid time off ("PTO") that can be used for vacation, personal or family illness, doctor appointments, school, volunteerism, and other activities of the employee's choice. (*Id.* ¶ 8.) Excessive use of PTO, however, can be disruptive to Humana's business and employee morale, so employees are expected to provide as much advance notice as possible when they will be absent from work, and to be punctual and in attendance every day they are scheduled to work. (*Id.*)

Humana also has a policy which sets out the procedures for requesting accommodations under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* (*Id.* ¶ 11.) In addition, it has a policy setting out the procedures for requesting leave under the FMLA. (*Id.* ¶ 12.) Finally, Humana has a policy against discrimination based on factors protected by federal, state, or local law. (*Id.* ¶ 9.) Humana provides employees several ways in which to raise concerns in the workplace, including a toll-free ethics hotline and the ability to report concerns to supervisors, managers, or human resources. (*Id.* ¶ 10.)

## I. Unruh's Employment with Humana

Plaintiff is licensed as a registered nurse. (*Id.* ¶ 13.) She holds an associate's degree in nursing education, a bachelor's degree in consumer economics and family management, and a master's degree in registered nurse health education. (*Id.*) She began working for Humana on March 2, 2014, in the Utilization Review department. (*Id.* ¶ 14.) Her initial salary was $2,730.77 biweekly, or about $71,000 annually. (*Id.* ¶ 18.) While employed by Humana, Plaintiff acted as a clinical RN advisor for sub-acute matters, collaborating with healthcare providers in reviewing actual and proposed medical care and services for Humana Plan members against established guidelines review criteria. (*Id.* ¶ 15.) She worked with a team of other clinical RN advisors, and was responsible for the admission review, post-discharge calls, and discharge planning for Humana Plan members for several long-term care facilities. (*Id.* ¶ 16.) During the March 2014 to May 2015 time period, 13 people including Plaintiff held clinical RN advisor positions at the Oak Brook office and reported to Kavelle. (*Id.* ¶ 20.) Plaintiff was 44 at that time, and the other advisors ranged in age from 32 to 62. (*Id.*)

Plaintiff's position with Humana was one which allowed for her to work from home. (*Id.* ¶ 17.) In order to work from home, however, new Humana employees must first successfully pass several audits for accuracy and adherence to company protocols. (*Id.*) If an employee is not successfully working from home, Humana may require the employee to work in the office. (*Id.*) When Plaintiff first began with Humana, she was required to work at least two days per week in Humana's Oak Brook office. (*Id.*)

Plaintiff received a week of training in Kentucky when she first began with Humana, followed by classroom training in the Oak Brook office. (*Id.* ¶ 22.) In July 2014, Kavelle had a

3

one-on-one meeting with Plaintiff in which they discussed her productivity. (*Id.* ¶ 23.) They discussed the importance of working from the Oak Brook office two days per week, and Plaintiff was reminded to provide advance notice when she would not be able to work. (*Id.*) These topics were addressed again in a coaching session the following month. (*Id.* ¶ 24.) Plaintiff told Kavelle in August 2014 that she could not come to the office because of car troubles. (*Id.*)

On September 26, 2014, Kavelle met again with Plaintiff for her mid-year progress review. (*Id.* ¶ 25.) They discussed the importance of communicating with front line leaders when Plaintiff would be unable to work at the office. (*Id.*) In January 2015, Kavelle asked RN Clinical Advisor Jessica Goulding ("Goulding") to schedule a side-by-side meeting with Plaintiff in order to observe her work and help her improve it. (*Id.* ¶ 26.) When Goulding reached out to Plaintiff, however, she advised that she did not know when she could come into the office. (*Id.*)

Plaintiff met with Goulding and another employee named Bob Unger on January 19, 2015. (*Id.* ¶¶ 25, 28.) Unger reported to Kavelle that Plaintiff's notes were disjointed and failed to include several required processing steps. (*Id.*) He noted that Plaintiff usually refused help from others, and was unwilling to accept feedback. (*Id.* ¶ 28) That same day, Plaintiff reached out to Kavelle about which facilities and assignments she was supposed to be handling. (*Id.*) Kavelle asked Plaintiff to meet with Goulding for guidance, and reminded her of the importance both of in-person trainings, and in-office attendance when requested. (*Id.*) Plaintiff again resisted. (*Id.*)

That same day, Kavelle requested scheduling Plaintiff's annual performance review. (*Id.* ¶ 31.) Plaintiff provided one date in response, adding that she would not be available for a week thereafter because she was taking PTO. (*Id.* ¶ 31.) Despite the short notice, Plaintiff was permitted the time off. (*Id.*) On January 20, 2015, Goulding reported to Unger and Kavelle that

4

he had reviewed Plaintiff's work queue, found it to be in disarray, and spent three hours fixing it. (*Id.* ¶ 32.) Other workers similarly reported difficulty working with Plaintiff's cases. (*Id.*)

On January 27, 2015, Plaintiff and Kavelle met for her performance review. (*Id.* ¶ 33.) Plaintiff received a rating of "inconsistent" overall and in several specific subcategories, and a rating of "full" in a few others. (*Id.*) Kavelle noted that Plaintiff required re-training in the office, but that Plaintiff resisted it. (*Id.*) Plaintiff was encouraged to review Humana's policy regarding working at home, and advised that she needed to be more open to attending meetings and/or trainings at management's request. (*Id.*) After her performance review, however, Plaintiff continued to work outside of established business hours and was not online when she was expected to be. (*Id.*) On January 30, 2015, Kavelle counseled Plaintiff on the company's expectations, namely, that she was expected to begin work between 7:00 and 9:00 a.m., and to work eight hours per day including a lunch. (*Id.*) She reminded Plaintiff that if she was unable to make personal appointments during her lunch hour or outside of work, she was to contact Kavelle for approval. (*Id.*)

About a week later, Plaintiff had another side-by-side training with Goulding. (*Id.* ¶ 37.) He reported that Plaintiff was not familiar with standard processes for completing work on which she had previously been trained. (*Id.*) On February 23, 2015, a Humana auditor informed Kavelle that two of Unruh's telephone calls had not followed Humana procedures, were inappropriate, and adversarial. (*Id.*) The next day, Kavelle, Schoenheider, and Unruh met by telephone for a coaching session. (*Id.* ¶ 38.) They reminded Plaintiff of the required working hours, noted time gaps in logs of her work, and discussed the inappropriate calls. (*Id.*) Kavelle and Schoenheider advised Plaintiff to let them know if she felt overwhelmed with her caseload. (*Id.*) Plaintiff did not respond to that or request a caseload reduction. (*Id.*) In March 2015, Plaintiff's work was

again audited and found to be out of compliance and poorly documented. (*Id.*) Accordingly, Kavelle decided to put Plaintiff on a Competency and Contribution Improvement Plan ("CCIP"). (*Id.* ¶ 41.)

### A.    The CCIP

On or about April 22, 2015, Kavelle and Schoenheider met with Plaintiff to issue her the CCIP. (*Id.* ¶ 42.) The CCIP focused on plaintiff's behavior as well as her work assignments, and noted that she had engaged in unprofessional communications with a provider, and that she was resistant to attending training sessions and meetings with leadership. (*Id.*) The CCIP noted a litany of problems: submitting fragmented documentation and incomplete post-acute clinical forms; copying and pasting information into areas that were not required which made it look like Plaintiff was being more productive than she actually had been; sending incorrect letter requests to the compliance department which then required correcting; submitting incorrect processing information to facilities; submitting documentation in a manner than made it difficult for coworkers to follow and caused them to perform unnecessary work; not working regularly scheduled hours; and taking unscheduled time away from work for personal appointments. (*Id.* ¶ 42.) It outlined the expectations Plaintiff was to meet, including attending in-person meetings when asked, following proper protocol on routine work assignments, and not being absent during the workdays to attend to personal appointments. (*Id.* ¶ 44.) Plaintiff was advised that the CCIP would continue through October 16, 2015, and that the failure to meet expectations during the CCIP period would result in immediate termination. (*Id.*) Plaintiff was told that Kavelle would meet with her weekly to discuss her progress in meeting the CCIP's expectations. (*Id.*)

6

After the meeting, a copy of Plaintiff's CCIP was faxed to Plaintiff's attention, but routed to a team inbox since Plaintiff's fax line had been set to forward there. (*Id.* ¶ 45.) The person tasked with opening and distributing team faxes notified Kavelle of the error. (*Id.* ¶ 46.)

On about April 28, 2015, Plaintiff called Humana's Ethics Line to report that her CCIP had been forwarded to the team fax box, and Humana subsequently investigated her complaint. (*Id.* ¶¶ 47, 48.) On May 1, 2015, Plaintiff submitted a "Resolving Issues Report Request Form," in which she disagreed with the CCIP and requested its removal from her employee file. (*Id.* ¶ 48.) An investigation began, but was never completed because Plaintiff took a leave of absence from Humana shortly thereafter. (*Id.*)

### B.    FMLA Leave

Plaintiff testified that she was diagnosed with general anxiety in 2006 but that it did not affect or limit her ability to do her job. (*Id.* ¶ 69.) Similarly, she testified that she was first diagnosed with celiac disease in 2010 or 2011, but that neither celiac disease nor migraines affected her work. (*Id.* ¶¶ 69, 71.) Although Plaintiff testified that she told Kavelle in 2014 about having celiac disease, Kavelle testified that she was not informed of it until May 13, 2015, when Plaintiff mentioned it in conjunction with a request to leave work early the following day. (*Id.* ¶ 71.)

On April 23, 2015, Plaintiff sought FMLA leave for her parent's serious health condition. (*Id.* ¶ 54.) UNUM, Humana's third-party administrator for FMLA and short-term disability leave at the time, approved Plaintiff for intermittent leave between April 23, 2015, and October 22, 2015. (*Id.*) Plaintiff also requested leave for her own serious health condition on April 23, 2015. (*Id.* ¶ 48.) She had not requested FMLA leave previously because she did not believe it was necessary. (*Id.* ¶¶ 52, 53, 58, 63.)

7

The healthcare provider certification that Plaintiff submitted in support of her FMLA leave request was dated May 18, 2015, and noted that Plaintiff was diagnosed with "severe anxiety, headaches, GI upset due to significant work related/triggered stress," but did not mention celiac disease. (*Id.*) The certification noted that Plaintiff's conditions began on April 22, 2015, she began treatment on April 27, 2015, and she was unable to perform all of the functions of her job. (*Id.*)

Plaintiff was approved by UNUM for continuous FMLA leave for her own serious health condition from May 15, 2015, through June 14, 2015. (*Id.* ¶ 56.) Her subsequent request for an extension of FMLA leave for her own condition was also approved to its exhaustion date of August 1, 2015. (*Id.* ¶ 56.) Thereafter, Plaintiff continued on leave under short-term disability through November 11, 2015. (*Id.* ¶ 57.)

Plaintiff never returned to work after her continuous leave of absence began on May 15, 2015. (*Id.* ¶ 57.) While she was on leave, Humana reached out to her to discuss accommodations, but Plaintiff did not provide any of the information the company requested. (*Id.* ¶¶ 59, 60.) On December 13, 2016, Humana informed Plaintiff that her employment had been terminated effective December 6, 2016, since she had exhausted all available leave and remained unable to work, sought an indefinite leave, and had failed to engage in an interactive accommodation process. (*Id.* ¶ 59.)

### C.    Complaint of Discrimination

On about August 17, 2015, Plaintiff filed a charge of discrimination with the Illinois Department of Human Rights ("IDHR"), alleging discrimination on the basis of age, marital status, and disability. (*Id.* ¶ 61.) Plaintiff also alleged retaliation in the form of unpaid wages. (*Id.*)

8

## PROCEDURAL HISTORY

This action was removed from the Circuit Court of Cook County on March 6, 2017 (R. 1, Notice of Rem.) An amended complaint was filed on April 18, 2017 (R. 14, Am. Compl.), which Defendants answered on May 10, 2017. (R. 19, Answer.) Plaintiff's retained counsel withdrew on October 2, 2017 (R. 32, Order), and counsel was recruited to represent Plaintiff on November 2, 2017. (R. 35, Order.) After Plaintiff's appointed attorney requested relief from the assignment, the Court recruited three additional attorneys to represent her, each of which sought and were granted leave to withdraw. (R. 40, 46, 54, 58, 62, and 68, Orders.) Plaintiff has proceeded *pro se* since her fourth recruited counsel's withdrawal. (R. 68, Order.)

Defendants moved for summary judgment on April 12, 2019. (R. 86, Defs.' Mot.) On June 20, 2019, Plaintiff filed two responses in opposition to the motion (R. 90, Pl.'s Resp.; R. 91, Pl.'s Second Resp.), and on June 25 and July 8, 2019, she filed two more. (R. 92, Pl.'s Third Resp.; R. 93, Pl.'s Fourth Resp.) Defendants replied on July 12, 2019. (R. 94, Defs.' Reply.)

When it came to the Court's attention that Plaintiff had not been served with the "Notice to Pro Se Litigant Opposing Motion for Summary Judgment" that is required by Northern District of Illinois Local Rule 56.2, Defendants were ordered to serve her with one and Plaintiff was given the opportunity to supplement her previous filings with one that better comported with the rules. (R. 98, Min. Entry.) The Court noted that none of Plaintiff's four filings in opposition to the summary judgment motion appeared to be directed to Defendants' Local Rule 56.1 statement or to several of Defendants' legal arguments, and reminded Plaintiff of the availability of the District Court's *Pro Se* Assistance Program. (*Id.*) Plaintiff subsequently filed a response to the first few paragraphs of Defendants' lengthy Local Rule 56.1 statement, but failed to respond

to the remainder or to provide any record in support of her assertions. (R. 99, Pl.'s Resp. Defs.' SOF.)

## LEGAL STANDARD

### I.    Federal Rule of Civil Procedure 56

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Daugherty v. Page*, 906 F.3d 606, 610 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Under Rule 56, the movant has the initial burden of establishing that a trial is not necessary. *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014). "That burden may be discharged by showing . . . that there is an absence of evidence to support the nonmoving party's case." *Id.* (internal quotation omitted). If the movant carries this burden, the nonmovant "must make a showing sufficient to establish the existence of an element essential to that party's case." *Id.* (internal quotation omitted). The nonmovant "must go beyond the pleadings (*e.g.*, produce affidavits, depositions, answers to interrogatories, or admissions on file) to demonstrate that there is evidence upon which a jury could properly proceed to find a verdict in [his or her] favor." *Id.* (internal quotation omitted). Not all disputes of fact preclude summary judgment, but instead, only those that are both material and genuine. *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). Factual disputes that are irrelevant or unnecessary do not preclude summary judgment. *Id.*

10

## II.    Northern District of Illinois Local Rule 56.1

Northern District of Illinois Local Rule 56.1 governs how the parties identify material

facts and potential disputed material facts. N.D. ILL. L.R. 56.1. "The purpose of Rule 56.1 is to

have the litigants present to the district court a clear, concise list of material facts that are central

to the summary judgment determination. It is the litigants' duty to clearly identify material facts

in dispute and provide the admissible evidence that tends to prove or disprove the proffered

fact." *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015). Local Rule 56.1(a)

"requires the party moving for summary judgment to file and serve a 'statement of material facts

as to which the moving party contends there is no genuine issue and that entitle the moving party

to a judgment as a matter of law.'" *Id.* at 218 (quoting N.D. ILL. L. R. 56.1(a)(3)). "The non-

moving party must file a response to the moving party's statement, and, in the case of any

disagreement, cite 'specific references to the affidavits, parts of the record, and other supporting

materials relied upon.'" *Petty v. City of Chicago*, 754 F.3d 416, 420 (7th Cir. 2014) (quotation

omitted); *see also* N.D. ILL. L. R. 56.1(b)(3)(A). The failure to file a timely response to a

summary judgment motion may result in the Court deeming admitted the uncontroverted facts in

the moving party's Local Rule 56.1 submission to the extent they are supported by evidence in

the record. *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 880 (7th Cir. 2012).

The Local Rules also require service of a "Notice to Pro Se Litigant Opposing Motion

for Summary Judgment." N.D. ILL. L.R. 56.2. The notice explains how to respond to a

summary judgment motion and statement of undisputed facts, and warns that a failure to respond

in accordance with the procedures set out in the rules will compel the Court to consider the

movant's well-supported factual contentions undisputed. (R. 97, Notice to *Pro Se* Litigant.)

Despite these general admonitions and this Court's specific warning that Plaintiff's first four

11

filings had not complied with the rules, Plaintiff failed to file a supported response in opposition to Defendant's proposed statements of undisputed facts. (*See* R. 95, Min. Entry; R. 90, Pl.'s Resp.; R. 91, Pl.'s Second Resp.; R. 92, Pl.'s Third Resp.; R. 93, Pl.'s Fourth Resp.; R. 99, Pl.'s Resp. Defs.' SOF.) Instead, Plaintiff filed a document that purported to respond to the first handful of Defendants' 80 statement of facts, but did so by way of argument and unsupported factual assertions well beyond the scope of Defendants' statements. (R. 99, Pl.'s Resp. Defs.' SOF.) Even where Plaintiff referred to certain specific records she says supports her claims, she did not provide them to the Court. (*Id.*) Consistent with the standards relating to summary judgment and Plaintiff's *pro se* status, however, the Court has nevertheless considered and liberally construed the relevant arguments in each of Plaintiff's submissions despite her numerous assertions of unsupported fact and inappropriate and improper arguments. (*See* R. 90, Pl.'s Resp.; R. 91, Pl.'s Second Resp.; R. 92, Pl.'s Third Resp.; R. 93, Pl.'s Fourth Resp.; R. 99, Pl.'s Resp. Defs.' SOF.)

The Court recognizes that Plaintiff is proceeding *pro se*, but even *pro se* litigants are required to comply with applicable procedural rules. *McNeil v. United States*, 508 U.S. 106, 113 (1993) ("[W]e have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006) (holding that "even *pro se* litigants must follow the rules of civil procedure"). Accordingly, to the extent Defendant's Local Rule statement is supported by the record, it is deemed admitted. *Frey Corp. v. City of Peoria*, 735 F.3d 505, 513 (7th Cir. 2013); *Nowak v. Transp. Joint Agreement of Cmty. Consol. Sch. Dist. No. 47*, 255 F. App'x 85, 87 (7th Cir. 2007) ("A district court may insist upon strict adherence to its local rules even from a *pro se* litigant, and if a party opposing summary judgment fails to comply with its obligations

12

under Local Rule 56.1, the court may in its discretion deem the motion unopposed[.]" (internal citations omitted).

## ANALYSIS

### I.    FMLA Claims (Counts III and IV)

According to Defendants, summary judgment should be entered against Plaintiff on her FMLA claims because Plaintiff cannot establish that she was eligible for FMLA leave prior to March 2, 2015, that she was entitled to FMLA leave, or that she provided sufficient notice of her intent to take FMLA leave. (R. 87, Defs.' Mem. at 4.) Even if Plaintiff could establish a prima facie case, Defendants add, her claim would still fail because Humana had a legitimate non-pretextual reason for issuing her the CCIP and for terminating her employment when she did not return to work. (*Id.*) Plaintiff alleges that she was qualified to take FMLA leave due to her serious health condition, and she requested intermittent FMLA leave or a reduced leave schedule to seek medical treatment, but she failed to provide evidence from which such things could be established. (R. 14, Am. Compl. ¶¶ 15-17; R. 90, Pl.'s Resp.; R. 91, Pl.'s Second Resp.; R. 92, Pl.'s Third Resp.; R. 93, Pl.'s Fourth Resp.; R. 99, Pl.'s Resp. Defs.' SOF.)

In order to prevail on a FMLA interference claim, an employee must show that: (1) she was eligible for FMLA protection; (2) her employer was covered by the FMLA; (3) she was entitled to leave under the FMLA; (4) she provided sufficient notice of her intent to take FMLA leave; and (5) her employer denied her the right to FMLA benefits. *Nicholson v. Pulte Homes Corp.*, 690 F.3d 819, 825 (7th Cir. 2012). The healthcare provider certification that Plaintiff provided Humana is dated May 18, 2015, indicates that her conditions began on April 22, 2015, and that her treatment began on April 27, 2015. (R. 88, Defs.' SOF ¶ 55.) No evidence in the record suggests that Plaintiff was receiving treatment for any of her asserted serious health

conditions earlier. (*See id.*) To the contrary, Plaintiff testified that prior to her FMLA leave, neither celiac disease nor migraines impacted her ability to work. (*Id.* ¶¶ 69, 71.) Without evidence to suggest that Plaintiff had earlier sought or was receiving treatment for her condition, she cannot establish that she suffered from a serious health condition under the FMLA. *Guzman v. Brown Cty.*, 884 F.3d 633, 638-39 (7th Cir. 2018) (affirming summary judgment for employer on FMLA claim where plaintiff had no evidence to show treatment for diagnosed condition).

In light of Plaintiff's testimony, her assertion that she told Kavelle of her condition does not save her claim. Plaintiff testified that she could not recall ever telling Kavelle or Schoenheider that she suffered from anxiety and migraines, and that prior to her taking leave, she had only mentioned celiac disease in the context of explaining why she could not eat certain foods and why she had a dentist appointment. (*Id.* ¶¶ 68-72.) The FMLA requires that an employee "provide sufficient information for an employer to reasonably determine whether the FMLA leave may apply to the leave request. . . . Calling in 'sick' without providing more information will not be considered sufficient notice to trigger an employer's obligation under the Act. 29 C.F.R. § 825.303(b). To trigger an employer's duty of inquiry, the employee must provide at least some information that would make the employer aware of the possible need for leave. *See Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 220 (7th Cir. 2015); *Burnett v. LFW, Inc.*, 472 F.3d 471, 479 (7th Cir. 2006). A casual mention of illness does not suffice to establish notice. *Nicholson*, 690 F.3d at 826 (finding employee's mention of need to care for aging parents insufficient as a matter of law to trigger employer's duty of inquiry). Instead, to put her employer on notice, Plaintiff must have at least alerted it to the seriousness of her health condition. *Id.* There is no evidence in the record that Plaintiff did so here. As Plaintiff testified, she did not

14

think that she needed FMLA leave prior to the date she took it. (R. 88, Defs.' SOF ¶ 58.)
Accordingly, Plaintiff's interference claim (Count III) fails.

Plaintiff's retaliation claim likewise fails. To survive summary judgment on a claim of
retaliation under the FMLA, Plaintiff "must present evidence that she was subject to an adverse
employment action that occurred because she requested or took FMLA leave." *Guzman*, 884
F.3d at 640; *accord Tibbs v. Admin. Office of the Ill. Courts*, 860 F.3d 502, 505 (7th Cir. 2017).
Plaintiff alleges she was unfairly disciplined and terminated for exercising her FMLA rights
(R. 14, Am. Comp. ¶¶ 31, 34), however she points to no evidence in the record to suggest any
causal link between the exercise of her rights and either her discipline or termination. (R. 90,
Pl.'s Resp.; R. 91, Pl.'s Second Resp.; R. 92, Pl.'s Third Resp.; R. 93, Pl.'s Fourth Resp.; R. 99,
Pl.'s Resp. Defs.' SOF.)

Further, despite Plaintiff's disagreement with the CCIP, standing alone it is not a
materially adverse employment action. *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d
866, 889 (7th Cir. 2016); *James v. Hyatt Regency Chi.*, 707 F.3d 775, 782 (7th Cir. 2013). For an
employer's action to be defined as materially adverse, "it must be more disruptive than a mere
inconvenience or an alteration of job responsibilities." *James*, 707 F.3d at 782 (internal quotation
omitted). "For example, a materially adverse change might be indicated by a termination of
employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a
material loss of benefits, significantly diminished material responsibilities, or other indices that
might be unique to a particular situation." *Id.* (internal quotation omitted). Plaintiff presents no
evidence to suggest that the CCIP in this instance had materially adverse consequences.
Moreover, it is undisputed that the CCIP was issued before Plaintiff exercised her FMLA rights
and before she gave Defendants notice of any need to do so. (R. 88, Defs.' SOF ¶¶ 42-45, 55.)

15

Accordingly, even if the CCIP could be considered an adverse employment action, no reasonable finder of fact could conclude it was causally related to Plaintiff's exercise of FMLA rights.

Plaintiff's termination also fails to support a retaliation claim because it is undisputed that Plaintiff was not meeting her employer's legitimate expectations at the time she was terminated. *See, e.g., Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 634-35 (7th Cir. 2009). The undisputed record shows that at the time Humana terminated Plaintiff, she had exhausted her FMLA leave, short term disability and unpaid leave of absence time, advised Humana that she remained unable to work, and had refused to engage in any interactive process. (R. Defs.' SOF ¶¶ 55-60, Ex. R, Dec. 13, 2016 Termination Letter.) Plaintiff demonstrates no issue of fact to the contrary.

Further, Plaintiff fails to offer evidence sufficient to support an inference that Humana's stated reason for her termination was false. Merely disagreeing with an employer's stated reason for termination does not create an issue of fact warranting a trial. *Tibbs*, 860 F.3d at 506. "A plaintiff must point to evidence tending to prove that the employer's proffered reasons are factually baseless, were not the actual motivation for the discharge in question, or were insufficient to motivate the termination." *Id.* (internal quotation omitted). Because Plaintiff fails to supply evidence in the record to suggest that Humana's termination was for any reason other than its stated one, a reasonable factfinder could not conclude that the stated reason for her termination was a pretext for FMLA retaliation. Summary judgment for Humana is accordingly granted on Plaintiff's retaliation claim (Count IV).

## II. Disability Discrimination Claims (Counts V and VI)

Plaintiff alleged a claim of failure to accommodate (Count V) and a claim of retaliation (Count VI) under the Illinois Human Rights Act, 775 ILL. COMP. STAT. 5/1-101 *et seq.* ("IHRA"). (R. 14, Am. Comp. ¶¶ 38-73.) Defendants argue summary judgment on Plaintiff's

failure to accommodate claim is appropriate because Plaintiff failed to exhaust her administrative remedies and fails to demonstrate that Humana knew of her claimed disabilities. (R. 87, Defs.' Mem. at 10-15.) Courts evaluate claims under the IHRA under the same framework as a discrimination claim under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"). *E.g., McKay v. Vitas Healthcare Corp. of Ill.*, 232 F. Supp. 3d 1038, 1043 (N.D. Ill. 2017) (analyzing ADA and IHRA claims under the same legal standard); *Reserve Marine Nutall v. Terminals*, No. 14 CV 4738, 2015 WL 9304350, at *8 (N.D. Ill. Dec. 22, 2015) ("The Illinois Supreme Court instructs that in evaluating claims of discrimination brought under the IHRA, courts should apply the same test employed by federal courts in evaluating causes of action brought pursuant to . . . the ADA.").

A.      **Failure to Accommodate (Count V)**

According to Defendants, Plaintiff failed to exhaust her administrative remedies because she did not allege a failure to accommodate in her IDHR charge of discrimination. (R. 87, Defs.' Mem. at 10-13.) Instead, Plaintiff complained of disparate treatment and retaliation in the form of reduced wages for complaining of discrimination. (R. 14-1, Am. Compl., Ex. C, Charge of Discrim.) Plaintiff subsequently filed a second charge of discrimination which also does not complain of a lack of accommodation. (*See* R. 47 at 3, Charge of Discrim.)

It is well settled that a plaintiff is barred from raising a claim in the District Court that has not previously been raised in an administrative charge of discrimination, unless the claim is reasonably related to the one in the charge or can be expected to develop from an investigation of it. *Riley v. City of Kokomo*, 909 F.3d 182, 189 (7th Cir. 2018). A failure to accommodate claim is "separate and distinct from a claim of discriminatory treatment." *Id.* at 190. "In fact, the two types of claims are analyzed differently under the law. . . . [T]hey are not like or reasonably

related to one another, and one cannot expect a failure to accommodate claim to develop from an investigation into a claim that an employee was terminated because of a disability." *Id.* (quoting *Green v. Nat'l Steel Corp.*, 197 F.3d 894, 898 (7th Cir. 1999)). Under these authorities, because Plaintiff did not allege any failure to accommodate in either charge of discrimination, she failed to exhaust her administrative remedies.

Even if Plaintiff had alleged this claim before the administrative agency, moreover, the claim would nevertheless fail because Plaintiff cannot establish that Humana knew of her claimed disabilities prior to her FMLA leave. To survive summary judgment on a failure to accommodate claim, Plaintiff must present evidence raising a triable issue of fact that: (1) she is a qualified individual with a disability; (2) Humana knew of her disability; and (3) Humana failed to reasonably accommodate it. *E.E.O.C. v. Autozone, Inc.*, 809 F.3d 916, 919 (7th Cir. 2016). A qualified individual is someone who with or without reasonable accommodation can perform the essential functions of her employment position. *Id.* It is "the duty of the individual seeking an accommodation to apprise the employer . . . of the employee's disabling condition and submit any necessary medical documentation. The individual must ordinarily initiate the request for accommodation and must cooperate in any ensuing discussions and evaluations aimed at determining the possible or feasible accommodations." 56 ILL. ADMIN. CODE. § 2500.40(c).

The undisputed record here shows that Plaintiff did not tell Humana that she suffered from anxiety or migraines prior to her FMLA leave, and that she only mentioned having celiac disease in the context of other discussions. (R. 88, Defs.' SOF ¶¶ 53-55.) Plaintiff was never denied the ability to attend appointments, and she testified that that she never sought a reduced

schedule or any other accommodation prior to taking FMLA leave because she did not think she needed one. (*Id.* ¶¶ 48, 52, 53, 63.)

To the extent that Plaintiff bases her claim on her unsuccessful attempt to transfer to another position at Humana, it also fails based on Plaintiff's own testimony. Specifically, Plaintiff testified that her conditions did not interfere with her ability to do her job, and that she had not indicated that her requested transfer was in order to accommodate any disability. (*Id.* ¶¶ 52, 53, 63.) While an employer's obligation to provide a reasonable accommodation might include reassigning a disabled employee to a different position where the employee can no longer perform the essential functions of her current position, the employer is not obligated to provide the employee with a reassignment simply in order to provide her the job that she would prefer. *E.g.*, *Stern v St. Anthony's Health Ctr.*, 788 F.3d 276, 287, 291 (7th Cir. 2015) (employer's obligation to reassign is limited to vacant positions at or below the employee's current position); *Malabarba v. Chi. Tribune Co.*, 149 F.3d 690, 699 (7th Cir. 1998) (noting employer's obligation is to provide some reasonable accommodation, not necessarily the one the employee prefers); *Gile v. United Airlines, Inc.*, 95 F.3d 492, 499 (7th Cir. 1996) (explaining that while ADA may require reassignment as a reasonable accommodation, the rule is not without "significant limitations").

Likewise, to the extent Plaintiff bases her claim on her termination from Humana, it fails for the reasons discussed above. The undisputed record shows that Plaintiff was terminated well after the expiration of her FMLA leave and extended unpaid leave, and upon her request for indefinite leave and inability to return to work. (R. 88, Defs.' SOF ¶¶ 59, 60; R. 88-18, Defs.' Ex. R, Termination Letter.) At the time of her termination therefore, Plaintiff could not perform

the essential functions of her job. *See Stern*, 788 F.3d at 287 (ability to perform essential

functions of job is evaluated at time of adverse employment action).

For each of these reasons, Defendants' motion for summary judgment on Plaintiff's

failure to accommodate claim (Count V) is granted.

### B.      Disparate Treatment (Count VI)

Defendants argue that summary judgment should be granted on Plaintiff's disparate

treatment claim because Plaintiff cannot show that she suffered an adverse employment action as

a result of her disability, or that she was otherwise treated disparately because of her disability.

(R. 87, Defs.' Mem. at 13-15.) Plaintiff argues that was subject to the following adverse actions:

(1) she was placed on a CCIP; (2) the CCIP was not kept confidential but was faxed to her entire

department; (3) her duties and responsibilities were increased and were more than others; (4) she

was denied a requested transfer; (5) she was denied the ability to attend medical appointments;

and (6) she was terminated. (*See* R. 14, Am. Compl. ¶¶ 74-87; R. 90, Pl.'s Resp.; R. 91, Pl.'s

Second Resp.; R. 92, Pl.'s Third Resp.; R. 93, Pl.'s Fourth Resp.; R. 99, Pl.'s Resp. Defs.' SOF.)

To sustain a claim of disparate treatment under the ADA, a plaintiff must show that: (1)

she suffers from a disability; (2) she is qualified to perform the essential functions of the job; and

(3) she has suffered an adverse employment action due to her disability. *Bunn v. Khoury Enters.,*

*Inc.*, 753 F.3d 676, 683 (7th Cir. 2014). The Seventh Circuit recently eliminated the distinction

between direct and indirect evidence in employment discrimination cases but retained the

burden-shifting framework of *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). *David v. Bd.*

*of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). Thus when an employer

can offer a legitimate, non-discriminatory reason for the adverse action, the plaintiff must

provide some evidence that the reason is pretextual. *Id.* at 225. Courts evaluate all the evidence

together to determine whether it would permit a reasonable factfinder to conclude that the plaintiff suffered an adverse employment action because of her disability. *McKay*, 232 F. Supp. 3d at 1045.

For all of the reasons discussed in Section I above, being placed on the CCIP and transmission of the CCIP to a general fax inbox are not materially adverse employment actions because neither materially changed the terms and conditions of Plaintiff's employment. *James*, 707 F.3d at 782. Also as discussed above, Humana had no obligation to effectuate a transfer for Plaintiff because there is no evidence in the record to suggest that she requested it as an accommodation, or that the denial of her requested transfer had anything to do with her claimed disability. (*See supra*, Sect. I.) As to the other claimed adverse actions, no evidence in the record suggests the necessary causal link that could sustain Plaintiff's claim. Plaintiff argues at length that other employees were not told that they had to attend to medical appointments outside of business hours, for example, but she has submitted no evidence to support her claim. (*See* R. 90, Pl.'s Resp.; R. 91, Pl.'s Second Resp.; R. 92, Pl.'s Third Resp.; R. 93, Pl.'s Fourth Resp.; R. 99, Pl.'s Resp. Defs.' SOF.) Plaintiff's own unsupported assertions are not enough to sustain her burden in responding to the summary judgment motion. *See* FED R. CIV. P. 56(e). Even if the Court were to construe Plaintiff's fourth-filed opposition to be the affidavit that she calls it, her statements therein do not save her claim because she asserts facts far beyond her personal knowledge. *See* FED R. EVID. 602; *Visser v. Packer Eng'g Assocs., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991).

As to her termination, no evidence in the record suggests that Humana's reason for the action was anything other than it said—namely, that Plaintiff had exhausted her leave, refused to engage in any interactive process, and indicated that she was not returning to work. *See Monroe*

21

*v. Ind. Dep't of Transp.*, 871 F.3d 495, 504 (7th Cir. 2017) (to survive summary judgment plaintiff must show a genuine issue of material fact regarding whether claimed disability was the "but for" reason for termination).

For these reasons, Defendants' motion for summary judgment as to Plaintiff's claim of disparate treatment (Count VI) is granted.

## III.     IHRA Retaliation (Count IX)

Defendants argue that summary judgment should be granted in their favor on Plaintiff's IHRA retaliation claim because there is no evidence that Plaintiff engaged in a protected activity, and that even if she did, there is no evidence that it was the reason for any adverse employment action. (R. 87, Defs.' Mem. at 17-18.) Plaintiff argues that after disputing being placed on a CCIP and after reporting to Humana's ethics hotline that the CCIP had been faxed to a general number, she was subjected to adverse actions by: (1) not being paid while on short-term disability; (2) being denied a transfer; (3) failing to remove the CCIP from her personnel file; and (4) not being given a reduced schedule or intermittent leave; and (5) termination. (*See* R. 14, Am. Compl. ¶¶ 101-119; R. 90, Pl.'s Resp.; R. 91, Pl.'s Second Resp.)

A retaliation claim under the IHRA requires Plaintiff to show that: (1) she engaged in protected activity; (2) Humana subjected her to an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action. *See Povey v. City of Jeffersonville*, 697 F.3d 619, 624 (7th Cir. 2012); *McKay*, 232 F. Supp. 3d at 1046. Here too the Seventh Circuit no longer distinguishes between direct and indirect evidence. *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016). The key question is simply whether "the record contain[s] sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused the discharge." *Id.*

According to Defendants, although Plaintiff disputed being placed on a CCIP, and reported to Humana's ethics hotline that her CCIP had been faxed to a general number, neither complaint alleged discrimination. (R. 87, Defs. Mem. at 17-18.) Notably, however, Plaintiff's dispute of her CCIP did allege discrimination in addition to disputing whether she had in fact missed too much time from work. (R. 88-13, Defs.' SOF Ex. M., Resolving Issues Report Request Form.) Accordingly, Plaintiff's retaliation claim does not necessarily falter on the requirement that she engage in a statutorily protected activity.

Even assuming, however, that Plaintiff's dispute of the CCIP could constitute protected activity, Plaintiff points to no evidence in the record to show that she suffered any adverse employment action as a result. (R. 90, Pl.'s Resp.; R. 91, Pl.'s Second Resp.; R. 92, Pl.'s Third Resp.; R. 93, Pl.'s Fourth Resp.; R. 99, Pl.'s Resp. Defs.' SOF.) For the same reasons discussed in the preceding sections, only Plaintiff's termination could constitute an adverse employment action, and the undisputed record shows that at the time Humana terminated Plaintiff, she had exhausted all leave, remained unable to return to work, and declined to engage in any interactive process. (R. 88, Defs.' SOF ¶¶ 59, 60; R. 88-18, Defs.' Ex. R, Termination Letter.) Plaintiff submits no evidence to support an inference that Humana's stated reason for her termination was false, and that retaliation was actually the reason for her termination. *See Tibbs*, 860 F.3d at 506.

Accordingly, Defendants' motion for summary judgment on Plaintiff's IHRA retaliation claim (Count IX) is granted.

## IV. IIED and Tortious Interference with Prospective Economic Advantage (Counts 10 and 11)

Defendants argue that summary judgment should be granted in their favor on Plaintiff's state law claims of intentional infliction of emotional distress (Count X) and tortious interference with prospective economic advantage (Count XI) because both are preempted by the IHRA and

barred by the exclusivity provision of the Illinois Workers' Compensation Act, 820 ILL. COMP. STAT. 305/1 *et seq.* Plaintiff focuses her opposition only on the severity of the distress about which she complains. (R. 90, Pl.'s Resp.; R. 91, Pl.'s Second Resp.; R. 92, Pl.'s Third Resp.; R. 93, Pl.'s Fourth Resp.; R. 99, Pl.'s Resp. Defs.' SOF.)

The IHRA gives the Illinois Human Rights Commission exclusive jurisdiction over civil-rights violations. 775 ILL. COMP. STAT. 5/8–111(D) ("Except as otherwise provided by law, no court of this state shall have jurisdiction over the subject of an alleged civil rights violation other than as set forth in this Act."). "Whether a state-law tort claim is preempted depends on whether the IHRA furnishes the legal duty that the defendant was alleged to have breached." *Bannon v. Univ. of Chi.*, 503 F.3d 623, 630 (7th Cir. 2007) (internal quotation and alteration omitted). "If the plaintiff's allegations against the defendant implicate only a duty provided by the IHRA, such as the duty of employers to refrain from discriminating against employees on the basis of their race or national origin, then the plaintiff's claim is preempted." *Id.* Whether a tort claim is preempted depends upon whether it is "inextricably linked to a civil rights violation such that there is no independent basis for the action apart from the [IHRA] itself." *Schroeder v. RGIS, Inc.*, 992 N.E.2d 509, 517 (Ill. App. Ct. 2013) (internal quotation omitted); *Veazey v. LaSalle Telecomms., Inc.*, 779 N.E.2d 364, 371 (2002) (claim that plaintiff was terminated based on race had no tort basis independent of the IHRA and was preempted). "Claims are inextricably linked where a plaintiff cannot 'establish the necessary elements of the tort independent of any legal duties created by the' IHRA." *Fuesting v. Uline, Inc.*, 30 F. Supp. 3d 739, 744 (N.D. Ill. 2014) (quoting *Maksimovic v. Tsogalis*, 687 N.E.2d 21, 24 (1997)).

Plaintiff alleges for her IIED claim that defendants knew that her medical conditions made her particularly susceptible to emotional distress, and that they nevertheless placed a CCIP

24

containing false statements about her in her personnel file and disclosed the CCIP to other employees at Humana, and that Humana's termination of her employment was "proximately related to its disability discrimination against [Plaintiff] and refusal to accommodate her disabilities." (R. 14, Am. Compl. ¶¶ 120-29.) Plaintiff complains of the same acts for her tortious interference claim, alleging that Kavelle and Schoenheider caused her emotional distress and purposefully interfered with her employment at Humana "to effectuate their own personal and vengeful motive to retaliate" because Plaintiff "had engaged in protected conduct under both the Illinois Human Rights Act and the Family Medical Leave Act." (R. 14, Am. Compl. ¶¶ 120-24, 133.) By Plaintiff's own allegations then, both claims are inextricably linked to the civil rights violations of which she complains. *Schroeder*, 992 N.E.2d at 517.

To the extent that any portion of either state law claim is not preempted by the IHRA, the claims nevertheless fail for lack of evidence. A claim of intentional infliction of emotional distress requires proof that: "(1) that the defendant's conduct was extreme and outrageous; (2) that the defendant knew that there was a high probability that his conduct would cause severe emotional distress; and (3) that the conduct in fact caused severe emotional distress." *Id.* A claim of tortious interference with prospective business advantage requires proof that: (1) plaintiff had a reasonable expectation of entering into a valid business relationship; (2) the defendants knew of her expectancy; (3) purposeful interference by defendants that prevented plaintiff's legitimate expectancy from ripening into a valid business relationship; and (4) damages to plaintiff resulting from such interference. *Fellhauer v. City of Geneva*, 568 N.E.2d 870, 878 (1991).

Plaintiff points to no evidence in the record to show that Kavelle or Schoenheider were involved in Humana's decision to terminate her, or that any defendant knew either that she was

particularly susceptible to emotional distress or that she had an expectation of continued employment with Humana until retirement. (*See* R. 90, Pl.'s Resp.; R. 91, Pl.'s Second Resp.; R. 92, Pl.'s Third Resp.; R. 93, Pl.'s Fourth Resp.; R. 99, Pl.'s Resp. Defs.' SOF.) Instead, Plaintiff's submissions focus on the accuracy of various assessments of her performance at Humana, the severity of her distress, and the blame she urges Defendants should carry not only for her own distress but also for the distress of certain coworkers. (*See, e.g.*, R. 91, Pl.'s Second Resp. at 9-10, 21-22, 24-27; R. 92, Pl.'s Third Resp. at 13, 17-23.) These arguments cannot substitute for evidence that supports her claims.

Accordingly, because the claims are preempted, and there is no evidence in the record from which a reasonable factfinder could find in her favor, Defendants' summary judgment motion is granted as to Plaintiff's state law claims of intentional infliction of emotional distress (Count X) and tortious interference with prospective economic advantage (Count XI) without reaching Defendants' remaining arguments.

## V.     FLSA and IMWL Claims (Counts I and II)

Defendants argue that summary judgment on Plaintiff's overtime claims under the FLSA, 29 U.S.C. § 201, *et seq.*, and the Illinois Minimum Wage Law ("IMWL"), 820 ILL. COMP. STAT. 105/1 *et seq.*, fail as a matter of law because both the professional and administrative exemptions apply. (R. 87, Defs.' Mem. at 23-28.) Plaintiff argues in opposition that she did not need to use her RN degree to perform her job, that social workers and licensed practical nurses performed the same work as she did, and that her job was simply to gather and review a member's medical charts and proposed care using established screening criteria and to collaborate with proposed medical care providers to determine the appropriate level of care. (R. 93, Pl.'s Fourth Resp. at 1-2.) Plaintiff emphasizes but submits no evidence to show that her

paystubs changed from salary to hourly notations over time, and that other employees have sued Humana for unpaid overtime pay. (*Id.*)

Under the FLSA and IMWL employees who work more than 40 hours per week are entitled to overtime compensation at the rate of one and one-half times their regular rate of pay for each overtime hour worked. *See* 29 U.S.C. § 207(a)(1); 820 ILL. COMP. STAT. 105/4a. Under the FLSA, an employee may be exempt from the overtime pay requirement if she is employed in a bona fide professional capacity. 29 U.S.C. § 213(a)(1). The Illinois Legislature has opted not to define the circumstances where an employee is exempt from the overtime requirements of the IMWL, instead deferring to Congress and the U.S. Department of Labor. *See Resurrection Home Health Servs. v. Shannon*, 983 N.E.2d 1079, 1086 (Ill. App. Ct. 2013). Accordingly, the exemption analysis is identical under either statute.

The professional exemption requires an employer to show that they have satisfied two tests: the salary-basis and the duties test. In order to meet the salary-basis test at the time Plaintiff worked for Humana, the employee must have been compensated on a salary or fee basis of not less than $455 per week. 29 C.F.R. § 541.300(a)(1). The duties test is met if the employee's primary duties consist of work which requires advanced or specialized knowledge or training. 29 C.F.R. § 541.300. "[R]egistered nurses who are registered by the appropriate State examining board generally meet the duties requirements for the learned professional exemption." 29 C.F.R. § 541.301(e)(2).

It is undisputed that Plaintiff earned above the salary basis threshold of 29 C.F.R. § 541.300(a)(1). (R. 88, Defs.' SOF ¶ 18.) Similarly, the undisputed record shows that Plaintiff used her advanced or specialized knowledge in her work. (R. 88, Defs.' SOF ¶¶ 15-16; R. 88-1, Defs.' Ex., A, Pl.'s Dep. at 47:10-51:21.) Plaintiff's responsibilities included patient admission

27

review, post-discharge calls, and discharge planning for Humana Plan members for several long-term care facilities. (*Id.*) She collaborated with other healthcare providers in reviewing actual and proposed medical care and services, and exercised professional judgment in approving or denying medical admissions, continued stays, and discharges for the facilities. (R. 88, Defs.' SOF ¶¶ 15-16; R. 88-1, Defs.' Ex., A, Pl.'s Dep. at 44:21-45:09.) Although Plaintiff argues that her work depended solely upon following Humana's guidelines, she presents no evidence to support her assertions. Instead, the record demonstrates that although Plaintiff used Humana's guidelines in processing each file, her decisions and work for Humana involved her own expertise and judgment depending on the circumstances involved for each patient. (*Id.*) The fact that Plaintiff used Humana guidelines in performing her job does not dictate a contrary conclusion. *See, e.g., Rieve v. Coventry Health Care, Inc.*, 870 F. Supp. 2d 856, 865 (C.D. Cal. 2012) (finding case manager nurse exempt professional who utilized learned judgment and discretion as well as established guidelines and noting, "[A]lthough the Manual here contains guidelines as to Plaintiff's handling of each case, she must still deal with the individual intricacies of each patient's care"); *Powell v. Am. Red Cross*, 518 F. Supp. 2d 24, 41-42 (D.D.C. 2007) (finding medical assessment nurse exempt professional because she used her advanced knowledge as a nurse to make technical, medical decisions).

Because the Court concludes that Plaintiff meets the professional exemption precluding her from FLSA and IMWL coverage, summary judgment for Humana is granted on these claims (Count I and II) without reaching the remainder of Defendants' arguments.

## VI. Marital Status and Age Discrimination (Counts VIII and IX)

Plaintiff's remaining claims are for marital status discrimination and age discrimination under the IHRA. (R. 14, Am. Comp. ¶¶ 88-100). Defendants' motion suggests that the marital

28

status claim was voluntarily dismissed by Plaintiff, but the record reflects the voluntary dismissal

of Plaintiff's age discrimination claim, not the marital status discrimination one. (*See* R. 88,

Defs.' SOF ¶ 6; R. 23, Min. Entry.) Because the sole remaining claim of marital status

discrimination is based on state law and each of Plaintiff's federal claims fail, however, the

Court declines to retain jurisdiction over it and dismisses the claim without prejudice. *See* 28

U.S.C. § 1397(c); *Refined Metals Corp. v. NL Indus., Inc.*, No. 18-3235, 2019 WL 3955889, *6

(7th Cir. Aug. 22, 2019) (noting presumption that if federal claims drop out before trial, district

court should relinquish jurisdiction over state-law claims).

## CONCLUSION

The Court is very sympathetic to the difficulties Plaintiff has faced with her health, and

recognizes the strength with which she disagrees with Humana's employment decisions.

Nevertheless, the issue before the Court is whether Plaintiff presents any material issues of fact

that require a trial in light of the undisputed facts in the record. Because Plaintiff presents none,

the Court grants Defendants' motion for summary judgment (R. 86) as to all counts of the

complaint except the state law age discrimination claim (Count VII) which is dismissed without

prejudice.

The Clerk of the Court is directed to enter a final judgment in favor of the defendants.

Each party should bear their own costs.

ENTERED:

**Judge Rubén Castillo**
**United States District Court**

Dated:  September 24, 2019

29